UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

FLOYD J. LEE, JR.,                          )
                                            )
    Plaintiff,                          )
                                            )
    v.                                  )          CAUSE NO. 1:12-CV-00038
                                            )
MICHAEL J. ASTRUE,                          )
Commissioner of Social Security,            )
                                            )
    Defendant.                          )

## OPINION AND ORDER

Plaintiff Floyd J. Lee, Jr., appeals to the district court from a final decision of the

Commissioner of Social Security ("Commissioner") denying his application under the Social

Security Act (the "Act") for a period of disability and Disability Insurance Benefits ("DIB") and

Supplemental Security Income ("SSI").[1]  For the following reasons, the Commissioner's

decision will be AFFIRMED.

## I.  PROCEDURAL HISTORY

Lee applied for DIB and SSI in May 2007, alleging disability from July 27, 2003.  (Tr.

17.)  His claim was denied initially and upon reconsideration (Tr. 77-90), and Lee requested an

administrative hearing (*see* Tr. 91-95).  Administrative Law Judge ("ALJ") Rebecca LaRiccia

conducted a video hearing on August 31, 2009, at which Lee, who was represented by counsel,

and Lee's sister testified; a vocational expert ("VE") testified telephonically.  (Tr. 17, 35-72.)

On February 6, 2010, the ALJ rendered an unfavorable decision to Lee, concluding that

---

[1] All parties have consented to the Magistrate Judge.  (Docket # 14); *see* 28 U.S.C. § 636(c).

he was not disabled because he could perform a significant number of jobs in the national economy despite the limitations caused by his impairments.  (Tr. 17-29.)  The Appeals Council denied Lee's request for review, making the ALJ's decision the final decision of the Commissioner.  (Tr. 1-11.)

Lee filed a complaint with this Court on February 7, 2012, seeking relief from the Commissioner's final decision.  (Docket # 1.)  In his appeal, Lee argues that the ALJ improperly evaluated the opinions of Karen Lothamer, a clinical nurse specialist, and Judith Woodyard, a social worker and therapist.  (Opening Br. of Pl. in Social Security Appeal Pursuant to L.R. 7.3 ("Opening Br.") 17-22.)

## II.  FACTUAL BACKGROUND[2]

### A.  Background

At the time of the ALJ's decision, Lee was forty-four years old (*see* Tr. 27, 40), had obtained his high school equivalency degree and reportedly completed one year of college (Tr. 42, 355), and had previously worked as an assembly line worker, certified nursing assistant, driver/mover, laborer, cook, and machine cleaner (Tr. 220; *see* Tr. 42-44).  Lee alleges that he became disabled as of July 27, 2003, due to degenerative disc disease, hypertension, depression, and post-traumatic stress disorder ("PTSD").  (Opening Br. 2.)  Lee does not challenge the ALJ's findings with respect to his physical impairments; therefore, the Court will focus on the evidence pertaining to his mental limitations.

### B.  Lee's Testimony at the Hearing

At the hearing, Lee stated that he is single and primarily lives with one of his sisters and

---

[2] In the interest of brevity, this Opinion recounts only the portions of the 611-page administrative record necessary to the decision.

her children.  (Tr. 41-42.)  He testified that his depression symptoms started with daytime flashbacks of being rammed into a wall and stabbing his ex-girlfriend (for which he spent four years in prison) and being restless and unable to sleep or function around people.  (Tr. 52.)  Lee further reported hearing voices and that, while in prison, he saw a psychiatrist once a week due to his flashbacks.  (Tr. 46, 52.)  He is treated at Park Center, which Lee has found helpful.  (Tr. 53.)  He also indicated that he is on Seroquel, which helps him sleep through the night.  (Tr. 52.)

Lee described his typical day as keeping to himself in his room, where he watches television and lies around.  (Tr. 53-54.)  Although his sisters try to get him to go out and do things, Lee feels like he has lost the will to be around other people or do anything; he sometimes thinks of suicide.  (Tr. 54.)  He reported that he does not help with any household chores, do his own laundry (though he "probably" could), drive, or do his own shopping most of the time.  (Tr. 54-55.)  Sometimes he will go to the store with his sister or get a few things on his own.  (Tr. 54.)  Lee testified that he has problems bathing and dressing himself.  (Tr. 55.)  He stated that although he does not get along with his nieces and nephews, he gets along with his sisters most of the time, though he does not like being around them and tries to avoid them.  (Tr. 55.)  He related that he does not have any friends.  (Tr. 55.)

### C. Summary of the Relevant Medical Evidence

In March 2006, during his imprisonment, Lee saw Colleen Smith, M.S., presenting with symptoms of depression and anxiety, problems sleeping, and inability to trust anyone.  (Tr. 302.)  Ms. Smith diagnosed Lee with chronic PTSD and assigned him a Global Assessment of

Functioning ("GAF") score of 50.[3]  (Tr. 302.)

Ten months later, in January 2007, Lee, while still in prison, was seen by counselor Michelle L. Reeve for a mental health evaluation.  (Tr. 539-41.)  Lee reported depression, paranoia, obsessions, nightmares, "living in fear," hopelessness, sleeping all the time, hardly leaving his cell, and not trusting anyone.  (Tr. 539.)  He further related a story of being beaten in the county jail.  (Tr. 539.)  Lee was diagnosed with PTSD and assigned a GAF of 50.  (Tr. 540.)  A week later, Lee saw Dr. Alfredo Tumbali for a follow-up (Tr. 533-36) and reported increased depression with an exacerbation of nightmares of being beaten up in jail (Tr. 533).  He was again diagnosed with PTSD and given a GAF of 50.  (Tr. 534.)

At the end of January 2008, Lee saw counselor Paul Morentz for an initial review.  (Tr. 530-32.)  Mr. Morentz made normal mental status findings, diagnosed Lee with PTSD and depressive disorder, not elsewhere classified, and assigned him a GAF of 50.  (Tr. 530-31.)

In March, Dr. Tumbali performed an initial psychiatric evaluation on Lee.  (Tr. 519-23.)  He described Lee's depression as moderately severe and constant, but stable, and stated that his symptoms were aggravated by past traumatic memories.  (Tr. 519.)  Dr. Tumbali concluded that Lee had symptoms of a major depressive disorder and then diagnosed him with depressive disorder, not elsewhere classified, and PTSD and assigned him a GAF of 50.  (Tr. 521-22.)

---

[3] GAF scores reflect a clinician's judgment about the individual's overall level of functioning. AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed., Text Rev. 2000).  A GAF score of 21-30 reflects behavior that is considerably influenced by delusions or hallucinations, a serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation), or an inability to function in almost all areas (e.g., stays in bed all day; has no job, home, or friends). *Id.*  A GAF score of 41 to 50 reflects serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). *Id.*  A GAF score of 51 to 60 reflects moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or coworkers). *Id.*

The following month, Lee returned to Dr. Tumbali.  (Tr. 508-11.)  Dr. Tumbali noted that Lee was not compliant with his medication as prescribed.  (Tr. 509.)  Lee's diagnoses and GAF score remained unchanged.  (Tr. 510.)

In May, Lee saw Dr. Tumbali again (Tr. 496-99), complaining that he was not getting along well with his bunkmate and admitting to missing some of his morning medications due to lack of sleep at night (Tr. 496).  Dr. Tumbali again found that Lee was not compliant with his medication.  (Tr. 497.)  Lee's diagnoses were the same, but his GAF increased to 60.  (Tr. 498.)

After Lee was released from prison, Dr. Revathi Bingi, Ed.D., conducted a consultative psychological evaluation in July 2007 at the request of the state agency.  (Tr. 332-35.)  Dr. Bingi observed that Lee showed many pain behaviors, but was adequately dressed and groomed, had some insight into his problems, was able to focus on the task, and was a good historian.  (Tr. 332.)  Lee reported feeling sad "all the time," experiencing panic attacks in large crowds and when he sees police, and feeling a lot of fear.  (Tr. 332.)  He related that he had bad dreams and sometimes thought of suicide, but denied any hallucinations or suicide attempts.  (Tr. 332-33.)  Lee then admitted to some current suicidal ideation and past alcohol abuse.  (Tr. 333.)  Upon testing, Lee displayed good long-term memory; fair judgment; orientation to person, place, and time; and normal, relevant, and coherent speech; but had difficulty doing even simple math; could not attempt to do serials of 7s; and had a depressed, angry, and frustrated mood and flat affect.  (Tr. 333-34.)  Dr. Bingi noted that Lee was cooperative and interacted adequately with him.  (Tr. 334.)  Dr. Bingi then diagnosed him with major depression, recurrent and severe without psychotic features; PTSD; panic disorder with agoraphobia; and polysubstance dependence in possible remission and assigned him a GAF of 45. (Tr. 335.)

In July 2007, Lee saw Glenis Sundberg[4] of Park Center for an initial assessment (Tr. 354-60), reporting that he suffered from depression and anxiety, stayed in his room all day, and was afraid to interact with people due to fear of getting hurt (Tr. 354). He complained of frequent nightmares and flashbacks of past abuse and requested medication and therapy. (Tr. 354.) Lee acknowledged that he had trust issues to the point of avoiding contact with people and that he was unable to concentrate, follow directions, or be out in public because of this distrust. (Tr. 355.) Lee reported that he had recently got out of prison and was looking for work. (Tr. 356.)

Ms. Sundberg found Lee's strengths to be his completed education, including one year of college education; a history of victimization; appropriate appearance and behavior; normal insight, judgment, speech, thinking form, and thought content; and no orientation problems. (Tr. 357.) On the other hand, his limitations were noted as difficulty initiating or maintaining contact with others, difficulty establishing close relationships, difficulty maintaining occupational functioning, and being on probation or parole. (Tr. 357.) Ms. Sundberg diagnosed Lee with alcohol dependence, in full remission, and PTSD and assigned him a GAF of 28. (Tr. 358.)

About a month later, at the end of August 2007, Lee saw Karen Lothamer, CNS, at Park Center for a psychiatric evaluation. (Tr. 361-63.) His presenting complaints were anxiety, depression, nightmares, and flashbacks of past abuse. (Tr. 361.) Ms. Lothamer observed that Lee was oriented, his behavior was anxious and nervous, his mood was irritable, his affect was flat, and his speech was coherent with only minimal responses. (Tr. 361.) She then diagnosed

---

[4] Both parties state that Lee saw Karen Lothamer during this visit (Opening Br. 7; Mem. in Supp. of Comm'r's Decision 5), but the record reflects that Ms. Sundberg was the clinician that performed the assessment, that another person countersigned the assessment (the name is undecipherable, but it is clearly not Karen Lothamer), and that Vivian Hernandez, Ph.D., signed off on it (Tr. 360). Ms. Lothamer's name does not appear anywhere on this assessment form. (*See* Tr. 354-60.)

him with alcohol dependence and PTSD, assigned him a GAF of 28, and prescribed him medication, instructing him to return in one month.  (Tr. 362-63.)

The next month, J. Gange, Ph.D., a state agency psychologist, reviewed Lee's record and completed a "Psychiatric Review Technique" and "Mental Residual Functional Capacity Assessment."  (Tr. 336-53.)  In the psychiatric review, Dr. Gange found that Lee had affective and anxiety-related disorders, namely depression and PTSD.  (Tr. 336, 339, 341.)  As to Lee's functional limitations, Dr. Gange opined that Lee had mild restriction in his activities of daily living; moderate difficulties in maintaining social functioning and concentration, persistence, or pace; and no episodes of decompensation.  (Tr. 346.)

When assessing Lee's mental RFC, Dr. Gange found that Lee was moderately limited in his ability to understand and remember detailed instructions; carry out detailed instructions; work in coordination with or proximity to others without being distracted by them; interact appropriately with the general public; maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; respond appropriately to changes in the work setting; and set realistic goals or make plans independently of others.  (Tr. 350-51.)  In explaining his findings, Dr. Gange noted that no records could be obtained from Lee's psychiatric treatment in prison and concluded that Lee's activities of daily living appeared to be primarily limited by physical factors and lack of interest in interacting with the public.  (Tr. 352.)  Ultimately, Dr. Gange opined that Lee "might prefer to avoid public contact," but could complete simple, repetitive tasks.  (Tr. 352.)  A second state agency psychologist later affirmed this opinion.  (Tr. 364.)

A Park Center treatment plan completed by Judith Woodyard, a therapist and social

worker, in the beginning of January 2008 (Tr. 432-36), showed diagnoses of alcohol dependence and PTSD and a GAF of 46 (Tr. 432).  According to this plan, Lee began therapy and psychiatric treatment, but, after a short time, dropped out of both and did not request further services.  (Tr. 435.)  As such, Lee's case was closed.  (Tr. 435; *see* Tr. 429-30.)  A discharge report completed a day later explained that Lee was seen for a psychiatric evaluation and prescribed medications and that he returned for one psychiatric follow up before he dropped out of treatment and did not return for further psychiatric follow up visits or therapy appointments.  (Tr. 429-30.)

Almost four months later, at the end of April, Ms. Woodyard completed another treatment plan in Lee's case (Tr. 422-26); a discharge report also accompanied this plan (Tr. 420-21).  In both of these, Lee's diagnoses and GAF score remained unchanged.  (Tr. 420, 422.)  According to the progress summary, Lee's case was reopened after he dropped out of treatment in 2007.  (Tr. 420, 425.)  He was seen for an initial psychiatric evaluation and then no-showed for two follow-up medication reviews.  (Tr. 420, 425.)  Similarly, Lee was seen for two therapy sessions and then no-showed for a third.  (Tr. 420, 425.)  He did not request further services, and his case was once again closed.  (Tr. 425; *see* Tr. 420-21.)

In June, Lee returned to Park Center, and Tara Pelz performed an intake reassessment and diagnostic evaluation to reopen his case.  (Tr. 411-19.)  Lee again reported that he stayed in his room all day and was afraid to interact with people due to fear of getting hurt and complained of frequent nightmares and flashbacks of past abuse.  (Tr. 411.)  Ms. Pelz diagnosed Lee with PTSD and assigned him a GAF of 45.  (Tr. 416.)

Lee saw Ms. Lothamer again in August 2008 for another diagnostic evaluation.  (Tr. 407-10.)  On mental status exam, Ms. Lothamer noted that Lee was appropriately groomed and fully

8

oriented and that his speech was coherent with repetitive responses, but that his behavior was anxious and nervous, his mood was sullen, his affect was flat, and he had thoughts of anxiety and depression and flashbacks of past abuse. (Tr. 407.) She then diagnosed Lee with PTSD and assigned him a GAF of 45. (Tr. 409.)

A Park Center treatment plan from September 2008, completed by Ms. Woodyard (Tr. 402-06), showed a diagnosis of PTSD and a GAF of 45 (Tr. 402). According to the progress statement, Lee had attended several individual therapy sessions and a psychiatric evaluation, but, most recently, had not appeared or rescheduled either his therapy or medication reviews. (Tr. 405.) Ms. Woodyard further noted that Lee had a history of dropping out of treatment. (Tr. 405.) Lee's December 2008 treatment plan, also completed by Ms. Woodyard, includes diagnoses of PTSD and major depressive disorder, recurrent and severe with psychotic features, and a GAF of 45. (Tr. 396-401.) The progress statement indicated that Lee was working well with medication management and attended therapy regularly and participated well. (Tr. 400.)

A February 2009 treatment plan, again penned by Ms. Woodyard, indicated that Lee's diagnoses and GAF score were unchanged. (Tr. 442-47.) But this time, Ms. Woodyard noted that Lee had not been seen for therapy that quarter and that his counselor reported that he had not been consistent with medication management either. (Tr. 446.)

In March, Lee saw Ms. Lothamer again, reporting that he was tired of his life and that his therapist did not listen to him. (Tr. 437-41.) Ms. Lothamer found his mood depressed, fluctuating, and angry; judgment fair; attitude detached; behavior agitated and distractible; and affect blunted. (Tr. 437-39.) At the same time, his thought content, perception, and speech were normal; his appearance was appropriate; he had no memory problems or homicidal or suicidal

ideation; his thought form was coherent; he was awake and alert; and he was fully oriented.  (Tr. 437-39.)  Ms. Lothamer further indicated that Lee was fully compliant with his medication, but that he had gotten "much worse."  (Tr. 439.)

The following month, April 2009, Lee met with Ms. Woodyard for individual therapy. (Tr. 604-07.)  On mental status exam, his affect was blunted and his mood was irritable, depressed, and anxious, but otherwise the exam was normal.  (Tr. 604-05.)  Ms. Woodyard stated that Lee was active and engaged in the session.  (Tr. 604.)  On this same day, Ms. Woodyard also penned a letter relating Lee's diagnoses and opining that Lee was unable to work.  (Tr. 474.)

In May, Ms. Lothamer saw Lee again for medication management.  (Tr. 599-603.)  Lee reported that Seroquel had eliminated the voices and visions at night and that he was sleeping well.  (Tr. 599.)  He also stated that he planned to continue his therapy with "Bambi."  (Tr. 599.) His mental status exam was normal except for a flat affect.  (Tr. 600-01.)  Ms. Lothamer noted that Lee was fully compliant with his medication and was symptomatic but stable.  (Tr. 601-02.) The following day, Lee returned to see Ms. Woodyard, who found his affect blunted and his mood irritable, anxious, and hopeless; the rest of the mental status exam was normal.  (Tr. 595-96.)  A treatment plan completed that same month contained the same diagnoses and GAF score as the previous plan.  (Tr. 585-90.)  Ms. Woodyard, who completed this plan, stated that Lee was inconsistent in his attendance to both his therapy and medication management.  (Tr. 589.)

At the end of June 2009, Lee saw Ms. Woodyard again (Tr. 581-84); he reported feeling depressed and isolated from his family and friends and having angry impulses (Tr. 581).  On mental status exam, Ms. Woodyard's findings included a blunted affect and a depressed, irritable, anxious, angry, and fearful mood; the rest of the mental status exam appeared normal.

10

(Tr. 581-82.)  Ms. Woodyard noted that Lee was active and engaged in the session.  (Tr. 581.)

The next month, July 2009, Ms. Lothamer completed a "Mental Impairment Questionnaire" (Tr. 553-55) and a medical source statement concerning Lee's functional abilities (Tr. 556-57).  In the questionnaire, Ms. Lothamer indicated that Lee suffered from PTSD and major depressive disorder, recurrent and severe with psychotic features, that his current GAF was 45, and that his highest past year GAF was 40.  (Tr. 553.)  She further stated that she saw Lee with "the frequency consistent with accepted practice for the type of treatment and/or evaluation required for" Lee's medical conditions.  (Tr. 553.)  Ms. Lothamer opined that Lee would be absent from work more than four days a month because of his impairments or treatment.  (Tr. 555.)  In her medical source statement, Ms. Lothamer found that Lee had poor ability—meaning no useful ability to function—in all 22 areas of work-related activities.  (Tr. 556-57.)

Lee had another session with Ms. Woodyard in August 2009.  (Tr. 572-75.)  Ms. Woodyard observed that Lee's affect was restricted and his mood was depressed, irritable, anxious, and fearful, but that he was active and engaged in the session.  (Tr. 571-72.)  That same day, Ms. Lothamer also saw Lee for a medication review.  (Tr. 576-80.)  Lee reported that his medications were working, but he had limited money to pay for them.  (Tr. 576.)  His mood was depressed, his thought content was normal but depressive, and his behavior was appropriate but distractible; his mental status exam was otherwise normal.  (Tr. 576-78.)  Ms. Lothamer noted that Lee was fully compliant with his medication and symptomatic but stable.  (Tr. 578-79.)

A treatment plan also completed in August by Ms. Woodyard (Tr. 567-70) contained the same diagnoses, but Lee's current GAF increased to 53 (Tr. 567).  The plan related that Lee was

11

working well with medical services and attending scheduled therapy sessions, where he participated well.  (Tr. 570.)  He reported less depression and anxiety.  (Tr. 570-71.)

This same month, Ms. Woodyard completed a "Mental Impairment Questionnaire" (Tr. 558-60) and a medical source statement (Tr. 561-62).  In the questionnaire, Ms. Woodyard indicated that she did *not* see Lee with the frequency consistent with accepted medical practice for the type of treatment and evaluation required for Lee's medical conditions because of his "[l]imited ability and resources to get here."  (Tr. 558.)  Her diagnoses were PTSD and major depressive disorder, recurrent and severe with psychotic features.  (Tr. 558.)  She stated that his current GAF was 45 and his highest past year GAF was 51.  (Tr. 558.)  She opined that, due to his impairments or treatment, Lee would miss more than four days of work per month.  (Tr. 560.)

In her medical source statement, Ms. Woodyard found that Lee had poor ability to perform 13 of the 22 work-related activities and fair ability to perform 7 of these activities: that is, he could do the activity satisfactorily some of the time.  (Tr. 561-62.)  Ms. Woodyard further concluded that Lee had good ability—defined as the ability to perform the activity satisfactorily most of the time—to adhere to basic standards of neatness and cleanliness and be aware of normal hazards and take appropriate precautions.  (Tr. 561-62.)

The following month, September 2009, Lee saw Ms. Woodyard for individual therapy. (Tr. 563-66.)  He reported angry impulses, excessive worry and anxiety, feeling fearful and depressed, and persistent pain.  (Tr. 563.)  Ms. Woodyard's findings included a restricted affect and a depressed, anxious, angry, and fearful mood.  (Tr. 563.)

## III.  STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and

12

transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted). The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). Where the Commissioner's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 785 (7th Cir. 2003) (citation omitted).

To determine if substantial evidence exists, the Court reviews the entire administrative record, but does not reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.* Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003). Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision. *Clifford*, 227 F.3d at 869.

## IV.  ANALYSIS

### A.  The Law

Under the Act, a claimant is entitled to DIB or SSI if he establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A),

1382c(a)(3)(A).  A physical or mental impairment is "an impairment that results from
anatomical, physiological, or psychological abnormalities which are demonstrable by medically
acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. §§ 423(d)(3),
1382c(a)(3)(D).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process,
requiring consideration of the following issues, in sequence: (1) whether the claimant is currently
unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's
impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. §
404, Subpt. P, App. 1; (4) whether the claimant is unable to perform his past work; and (5)
whether the claimant is incapable of performing work in the national economy.[5]  *See Dixon v.
Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001); 20 C.F.R. §§ 404.1520, 416.920.  An
affirmative answer leads either to the next step or, on steps three and five, to a finding that the
claimant is disabled.  *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).  A negative answer
at any point other than step three stops the inquiry and leads to a finding that the claimant is not
disabled.  *Id.*  The burden of proof lies with the claimant at every step except the fifth, where it
shifts to the Commissioner.  *Clifford*, 227 F.3d at 868.

### B. The ALJ's Decision

On February 6, 2010, the ALJ rendered her decision.  (Tr. 17-29.)  At step one of the
analysis, the ALJ found that Lee had not engaged in substantial gainful activity since his alleged
onset date.  (Tr. 19.)  The ALJ then concluded at step two that Lee suffered from the following

---

[5] Before performing steps four and five, the ALJ must determine the claimant's residual functional capacity
("RFC") or what tasks the claimant can do despite his limitations.  20 C.F.R §§ 404.1520(e), 404.1545(a),
416.920(e), 416.945(a). The RFC is then used during steps four and five to help determine what, if any, employment
the claimant is capable of.  20 C.F.R. §§ 404.1520(e), 416.920(e).

severe impairments: degenerative disc disease, hypertension, depression, and PTSD.  (Tr. 19.)

Nonetheless, at step three, the ALJ determined that Lee's impairment or combination of

impairments did not meet or medically equal a listing.  (Tr. 20.)  Before proceeding to step four,

the ALJ determined that Lee's statements concerning the intensity, persistence, and limiting

effects of his symptoms were not credible to the extent they were inconsistent with the following

RFC:

> [T]he claimant has the residual functional capacity to perform light work . . . except
> the claimant can occasionally stoop and crouch.  He must avoid contact with the
> general public with no more than superficial contact with co-workers and occasional
> contact with supervisors.  The claimant can understand, remember and carry out
> simple work.

(Tr. 22.)

Moving onto step four, the ALJ found that Lee was unable to perform any past relevant

work.  (Tr. 27.)  At step five, however, the ALJ determined that Lee could perform a significant

number of jobs within the economy, including products assembler, inspector, and bagger.  (Tr.

28.)  Thus, Lee's claims for DIB and SSI were denied.  (Tr. 29.)

### C. The ALJ's Consideration of Ms. Lothamer's Opinion
### Is Supported by Substantial Evidence

Lee's first challenge to the ALJ's decision is that the ALJ improperly evaluated the

opinion of Ms. Lothamer, a clinical nurse specialist at Park Center.  (Opening Br. 17-21.)  At

bottom, however, Lee's argument equates to a plea to this Court to reweigh the evidence with the

hope that it will come out in his favor this time.  Of course, such a plea is ultimately not fruitful.

*See Cannon v. Apfel*, 213 F.3d 970, 974 (7th Cir. 2000) (explaining that the court is not allowed

to substitute its judgment for the ALJ's by "reweighing evidence").

To review, Ms. Lothamer opined, among other things, that Lee would miss more than

15

four days of work per month (Tr. 555), which, according to the VE, would exceed the allowable absenteeism for all the jobs he found Lee capable of performing (*see* Tr. 67-68), and that Lee had no useful ability to function in all 22 areas of work-related activities (Tr. 556-57).  Lee challenges the ALJ's reasons for discounting Ms. Lothamer's opinion—that it was "based on VERY limited treatment and on the claimant's rather incredulous [sic] complaints and very poor effort during therapy sessions."[6]  (Opening Br. 17 (emphasis in original) (quoting Tr. 24).)

Ms. Lothamer, a clinical nurse specialist, is considered an "other source" under the regulations.  *Furlow v. Astrue*, No. 10-554-CJP, 2011 WL 3555726, at *6 (S.D. Ill. Aug. 11, 2011); *see* SSR 06-03p, 2006 WL 2329939.  Opinions from "other sources" should be evaluated using the applicable factors set forth in 20 C.F.R. §§ 404.1527 and 416.927 for weighing medical opinions from "acceptable medical sources."[7]  SSR 06-03p, 2006 WL 2329939.  However, "[n]ot every factor for weighing opinion evidence will apply in every case."  *Id*.  The evaluation of an opinion from an "other source" "depends on the particular facts in each case."  *Id*.  Therefore, "[e]ach case must be adjudicated on its own merits based on a consideration of the probative value of the opinions and a weighing of all the evidence in that particular case."  *Id*.

First, Lee argues that the ALJ incorrectly found that Ms. Lothamer's opinion was based on "VERY limited treatment."  (Opening Br. 18.)  According to the reports in the record,

---

[6] It is unclear whether the ALJ uses these reasons to discount both Ms. Lothamer's and Ms. Woodyard's opinions or just Ms. Woodyard's opinion.  (*See* Tr. 24 (where the ALJ discusses Ms. Lothamer's opinion first and then considers Ms. Woodyard's opinion in the same paragraph, concluding that while Ms. Woodyard's opinion "is a more sincere opinion of function, it is still based on VERY limited treatment and on the claimant's rather incredulous [sic] complaints and very poor effort during therapy sessions")).)  Because the ALJ's use of the word "still" supports Lee's reading of this paragraph, the Court will accept that interpretation for purposes of this opinion.

[7] These factors include the following:  (1) how long the source has known and how frequently the source has seen the individual; (2) how consistent the opinion is with other evidence; (3) the degree to which the source presents relevant evidence to support an opinion; (4) how well the source explains the opinion; (5) whether the source has a specialty or area of expertise related to the individual's impairment(s); and (6) any other factors that tend to support or refute the opinion.  SSR 06-03p, 2006 WL 2329939.

16

between August 2007 and February 2010, the date of the ALJ's opinion, Ms. Lothamer saw Lee

five times. (*See* Tr. 361-63, 407-10, 437-41, 576-80, 599-603.) His first two psychiatric

evaluations with Ms. Lothamer occurred almost a year apart. (*See* Tr. 361-63 (Lothamer's first

evaluation of Lee on August 28, 2007), Tr. 407-10 (Lothamer's second evaluation of Lee on

August 5, 2008).) Lee's next visit with Ms. Lothamer contained in the record occurs seven

months later, in March 2009, when Lee saw her for a fifteen-minute medication review. (Tr.

437.) Ms. Lothamer saw Lee again two months later for another medication review; this visit

lasted only ten minutes. (Tr. 599.) Lee's last visit with Ms. Lothamer that appears in the record

was three months later, in August 2009, and again lasted only ten minutes. (Tr. 576.) But, as

Lee points out, there is some indication that Ms. Lothamer saw Lee at least two more times for

medication reviews. (*See* Tr. 400 (stating that "per CNS," who is identified in the treatment plan

as Ms. Lothamer (Tr. 396), "in 11/20/08 med review indicated that client continues to have

hallucinations"), 446 ("Last med review: 2/5/09").) But, if the length of the other medication

reviews is representative, neither of these visits was substantial.

As such, it appears that, over two and a half years, Ms. Lothamer conducted two

psychiatric evaluations of Lee a year apart, saw him three times for medication reviews that

lasted no more than fifteen minutes each, and may have seen Lee for two additional reviews. In

light of this evidence, and the documentation before her, the ALJ's conclusion that Ms.

Lothamer gave very limited treatment to Lee is reasonable, even despite Ms. Lothamer's

representation that she saw him with the frequency consistent with accepted medical practice.

This is particularly true because, at this step, Lee, who is represented by counsel, bears the

burden of proving he is disabled, *Castile v. Astrue*, 617 F.3d 923, 927 (7th Cir. 2010), which

includes furnishing medical and other evidence to support his disability claims, *see* 20 C.F.R. §§ 404.1512(a), 416.912(a). *See also Glenn* v. *Sec'y Health & Human Servs.*, 814 F.2d 387, 391 (7th Cir. 1987) ("When an applicant for social security benefits is represented by counsel the administrative law judge is entitled to assume that the applicant is making his strongest case for benefits.").

Lee next challenges the ALJ's finding that his complaints were rather incredible, arguing that a number of mental health examiners over a three-year period observed significant clinical signs and took his complaints seriously.  (Opening Br. 18.)  Specifically, Lee points to his sister's report, prison records, and GAF scores as contradicting the ALJ's assessment of his complaints and takes issue with the ALJ's reliance on Dr. Gange's opinion, which Lee maintains did not consider much of this evidence either.  (Opening Br. 18-20.)  But the ALJ explicitly considered the report and testimony of Lee's sister, giving it little weight as it appeared to be based on Lee's complaints rather than her own observations.  (Tr. 27.)  And the ALJ referenced Lee's prison records.  (*See* Tr. 26 (assigning little weight to the evidence supplied by the Indiana Department of Corrections).)  Lee nitpicks the ALJ's consideration of this evidence, arguing that her reference to PTSD is difficult to understand, but the ALJ was undoubtedly aware of this evidence, even if she did not specifically address each psychiatric evaluation Lee received in prison.  *See, e.g.*, *Smith v. Apfel*, 231 F.3d 433, 444 (7th Cir. 2000) (stating that "the ALJ is not required to evaluate in writing every piece of evidence submitted," but need only consider the important evidence such that the court can trace the path of her reasoning); *see generally Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004) (explaining that when reviewing the ALJ's decision, the court will "give the opinion a commonsensical reading rather than nitpicking at it").

18

As for Lee's argument that the ALJ committed legal error and "cherry-picked" the evidence by not mentioning the numerous GAF scores in the record, which Lee claims are inconsistent with the ALJ's opinion, "nowhere do the Social Security regulations or case law require an ALJ to determine the extent of an individual's disability based entirely on his GAF score." *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) (citation and internal quotation marks omitted); *accord Walters v. Astrue*, 444 F. App'x 913, 919 (7th Cir. 2011) (unpublished); *see Thomas v. Astrue*, No. 2:11-cv-188-PRC, 2012 WL 2130582, at *7 (N.D. Ind. June 12, 2012) ("[A] GAF score alone is not determinative of disability."); *Curry v. Astrue*, No. 3:09-CV-565 CAN, 2010 WL 4537868, at *7 (N.D. Ind. Nov. 2, 2010) ("GAF scores are more probative for assessing treatment options rather than determining functional capacity and a person's disability."). And although these "scores may assist in formulating the claimant's residual functional capacity," *Adams v. Astrue*, No. 1:06-CV-393 RM, 2009 WL 1404675, at *4 (N.D. Ind. May 18, 2009), they do "not reflect the clinician's opinion of functional capacity," *Denton*, 596 F.3d at 425.

If the ALJ had mentioned only the highest GAF score Lee received and ignored the numerous lower ones in the record, Lee's argument would have more traction. *See, e.g.*, *Walters*, 444 F. App'x at 919 (remanding the ALJ's decision where he cited the claimant's highest GAF scores and omitted the lower ones). Yet that the ALJ did not mention *any* of Lee's GAF scores does not justify a remand, particularly considering the volume of evidence the ALJ *did* explicitly mention, which included many of the reports that contained these GAFs (*see, e.g.*, Tr. 23-24 (discussing Lee's initial intake interview and assessment at Park Center in July 2007), 24 (discussing Dr. Bingi's consultative exam), 24-25 (further discussing the Park Center records

and Ms. Lothamer's and Ms. Woodyard's opinions)).  *See Boone v. Astrue*, No. 1:09-cv-250, 2010 WL 2943637, at \*7 (N.D. Ind. July 22, 2010) (affirming ALJ's decision where ALJ considered the claimant's entire medical history, but did not specifically mention the GAF scores in her decision); *Johnston v. Astrue*, No. 1:09-cv-3, 2009 WL 5175211, at \*9 (N.D. Ind. Dec. 22, 2009) (affirming ALJ's decision where he did not specifically mention the GAF score, but it was clear that he had considered the medical source opinion); *Mobley-Butcher v. Astrue*, No. 1:06-cv-934-DFH-JMS, 2007 WL 3124478, at \*11 (S.D. Ind. Sept. 6, 2007) (affirming ALJ's decision and concluding that the ALJ "did not omit significant pieces of information necessary to understand the entire medical picture" where he did not specifically mention the claimant's GAF scores).

Finally, regarding the ALJ's reliance on Dr. Gange's opinion, the ALJ assigned "some weight" to Dr. Gange's opinion about Lee's social interaction ability and need for simple work. (Tr. 26.)  Lee argues that this reliance was not reasonable because Dr. Gange, when giving his opinion, did not have Lee's prison records or acknowledge the report from Lee's sister, making his opinion selective.  (Opening Br. 19-20; Reply Br. 7.)  But even if Dr. Gange did not consider this evidence, as illustrated above, the ALJ *did* address this evidence in assigning Lee's RFC, which the ALJ bears the final responsibility for deciding.[8]  *Lane v. Astrue*, No. 1:10-CV-28 JD, 2011 WL 3348095, at \*11 (N.D. Ind. Aug. 3, 2011); *see* 20 C.F.R. §§ 404.1527(d)(2),

---

[8] Lee also notes that the state agency psychologists found a "moderate" degree of limitation in concentration, persistence, or pace (Tr. 346), while the ALJ only found a "mild limitation" (Tr. 20-21).  (Opening Br. 20.)  But in assigning the RFC, "the ALJ is not required to rely entirely on a particular physician's opinion or choose between the opinions of any of the claimant's physicians."  *Schmidt v. Astrue*, 496 F.3d 833, 845 (7th Cir. 2007).  Therefore, there is nothing wrong with the ALJ incorporating a lesser degree of limitation than the state agency psychologists found, especially when the ALJ gave their opinion only "some weight" (Tr. 26) and thoroughly articulated her reasons for finding only minimal difficulties in concentration, persistence, or pace (*see* Tr. 21).

416.927(d)(2); SSR 96-5p, 1996 WL 374183.  In doing so, the ALJ did exactly what she was

supposed to do; she considered the entire record, including all relevant medical and nonmedical

evidence—which included the prison records, the evidence from Lee's sister, the state agency

psychologists' opinion, and the Park Center treatment records—as well as Lee's own statement

about his capabilities.  *Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995).

After weighing all this evidence, the ALJ found that Lee was not fully credible (Tr. 22;

*see* Tr. 25 ("The claimant's credibility is again under strict scrutiny . . ."), 26 ("[T]hese are mere

presentations of the clamant's subjective complaints which are already under heightened

suspicion" and "[A]s noted above the claimant is not credible")) and that his complaints were

rather incredible (Tr. 24).[9]  It is not this Court's role to reweigh the evidence.  *See Cannon*, 213

F.3d at 974.  And the ALJ reasonably inferred that Ms. Lothamer's opinion was based primarily

upon Lee's subjective allegations, which the ALJ determined were under "strict scrutiny" and

not credible, and properly discounted her opinion on that basis.  (Tr. 25, 26); *see Ketelboeter v.

Astrue*, 550 F.3d 620, 625 (7th Cir. 2008) (stating that a treating physician's opinion can be

discounted if it is "based solely on the patient's subjective complaints"); *White v. Barnhart*, 415

F.3d 654, 659 (7th Cir. 2005) (discounting a treating physician's opinion because it was based on

claimant's "subjective complaints rather than accepted medical techniques"); *Stevenson v.

Chater*, 105 F.3d 1151, 1155 (7th Cir. 1997) (acknowledging that an ALJ is entitled to make

reasonable inferences from the evidence before him).

The ALJ's third purported reason for discounting Ms. Lothamer's opinion was that it was

---

[9] Lee does not challenge the ALJ's determination of his credibility and, as such, this argument is waived.
*See, e.g.*, *Palmer v. Marion Cnty.*, 327 F.3d 588, 597-98 (7th Cir. 2003) (holding that arguments not presented to the
court in a response to a summary judgment motion are deemed waived).

based on Lee's "very poor effort during therapy sessions." (Tr. 24.) But, as Lee argues,

although he had problems with attendance (*see* Tr. 405, 420, 425, 435, 446, 589) and was

dropped from treatment at Park Center once or twice (*see* Tr. 420-21, 429-30), when he did go to

therapy, he reportedly participated well (Tr. 400, 570) and was active and engaged (Tr. 572, 581,

604). Therefore, this reason for assigning little weight to Ms. Lothamer's opinion appears to be

mistaken. Yet, "[n]ot every mistake by an ALJ so undermines a determination that it cannot be

said to be supported by substantial evidence." *Bacidore v. Barnhart*, No. 01 C 4874, 2002 WL

1906667, at *10 (N.D. Ill. Aug. 19, 2002) (citation omitted). Because the ALJ's other stated

reasons provide substantial evidence for her decision to discount Ms. Lothamer's opinion, the

ALJ's mistake regarding Lee's effort during therapy did not change the outcome of this case,

making it harmless. *See Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004); *see also Fisher

v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989) ("[N]o principle of administrative law or common

sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe

that the remand might lead to a different result."); *Susalla v. Astrue*, No. 1:11-CV-00164, 2012

WL 2026268, at *10 (N.D. Ind. June 5, 2012) (finding that, despite the fact that the ALJ's

reasoning in one respect was lacking, "because the ALJ provided several other "good reasons" to

discount [a psychiatrist's] opinion, this misstep falls short of warranting a remand of the ALJ's

decision").

      Furthermore, later on in her decision, the ALJ further explained why she was discounting

Ms. Lothamer's opinion, stating that Ms. Lothamer's findings that Lee had no useful functional

capabilities at all was "not even consistent with the limited activities of daily living and actual

functional capabilities recorded by her throughout the Park Center records." (Tr. 26.)

According to Ms. Lothamer's observations in her treatment notes, Lee struggled with his mood and affect and sometimes his behavior, but not significantly with his appearance, orientation, memory, thought form, or, most of the time, his judgment, speech, or thought content.  (*See* Tr. 361, 407, 437-39, 576-78, 599-601.)  Yet Ms. Lothamer found Lee had no useful ability to understand and remember short, simple instructions; make simple work-related decisions; ask simple questions or request assistance; and adhere to basic standards of neatness and cleanliness. (Tr. 556-57.)  Of course, an ALJ may discount an opinion that is internally inconsistent.  *See Zblewski v. Astrue*, 302 F. App'x 488, 493-94 (7th Cir. 2008) (unpublished) (affirming the ALJ's discounting of a nurse's opinion where it was inconsistent with the medical evidence of record); 20 C.F.R. §§ 404.1527(c)(4), 416.927(c)(4) ("Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.").  As such, the inconsistencies between Ms. Lothamer's records and her opinion as to Lee's functional abilities provide even more support for the ALJ's decision to discount her opinion.

And the ALJ further noted the inconsistencies between Ms. Lothamer's opinion, penned in July 2009, and Ms. Woodyard's opinion, given less than a month later.  (*See* Tr. 24.)  Specifically, the ALJ pointed out how Ms. Lothamer found that Lee had absolutely no useful functional abilities, but, only several weeks later, Ms. Woodyard "was able to conclude nearly the exact opposite regarding the claimant's retained functional abilities," as Lee was "suddenly able to" understand, remember, and, carry out short, simple instructions; sustain an ordinary routine without special supervision; make simple work-related decisions; ask simple questions or request assistance; maintain socially appropriate behavior; and respond appropriately to changes in the work setting.  (Tr. 24 (quoting Tr. 561-62).)  An ALJ can consider that one source's

extreme limitations are inconsistent with other opinions and evidence in the record.  *See Elkins v. Astrue*, No. 4:10-cv-74-WGH-RLY, 2011 WL 2728398, at *11 (S.D. Ind. July 11, 2011) (affirming ALJ's decision not to give controlling weight to a treating doctor's opinion when the doctor's extreme findings were inconsistent with numerous other medical opinions and evidence in the record); *Harder v. Astrue*, No. 3:09-cv-43-WGH-RLY, 2010 WL 3447538, at *11 (S.D. Ind. Aug. 30, 2010) (same).  Accordingly, the ALJ properly discounted Ms. Lothamer's opinion and its extreme limitations based on inconsistencies between her own previous observations and other evidence in the record.[10]  *See Masch v. Barnhart*, 406 F. Supp. 2d 1038, 1056 (E.D. Wis. 2005) (upholding ALJ's rejection of nurse practitioner report where the ALJ compared the report to the other evidence in the record and reached a reasonable conclusion).

### D.  The ALJ 's Consideration of Ms. Woodyard's Opinion Is Supported by Substantial Evidence

Next, Lee argues that the ALJ improperly evaluated the opinion of Judith Woodyard, his therapist at Park Center.  (Opening Br. 21-22.)  Once again, Lee's challenge amounts simply to an impermissible plea to this Court to reweigh the evidence.

Ms. Woodyard opined, among other things, that Lee would miss more than four days of work per month.[11]  (Tr. 560.)  She further found that Lee had poor ability to perform 13 of the 22

---

[10] The ALJ also found that Ms. Lothamer's opinion as to Lee's functional abilities was inconsistent with his limited activities of daily living.  (Tr. 26.)  Although the ALJ could have done a better job explaining this reason, "[n]o principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result."  *Fisher*, 869 F.2d at 1057; *see also Smith v. Astrue*, No. 07-C-0955, 2008 WL 794518, at *7 (E.D. Wis. Mar. 24, 2008) ("[W]hile the ALJ's explanation for her rejection of this report could have been more thorough, as the opinion of an 'other source' I cannot conclude that the ALJ was required to say more.").  As the ALJ's other given reasons provide substantial evidence for the weight the ALJ assigned to Ms. Lothamer's opinion, a remand is not warranted for the ALJ's failure to fully articulate how Ms. Lothamer's opinion was inconsistent with Lee's activities.

[11] Ms. Woodyard also penned a statement of disability in April 2009, in which she opined that Lee was unable to work.  (Tr. 474.)  Lee does not challenge the ALJ's reasons for discounting this opinion (*see* Tr. 24, 26).

24

work-related activities; fair ability to perform 7 of those activities—including understanding and remembering short, simple instructions; carrying out short, simple instructions; sustaining an ordinary routine without special supervision; making simple work-related decisions; asking simple questions or requesting assistance; maintaining socially appropriate behavior; and responding appropriately to changes in the work setting—and good ability to adhere to basic standards of neatness and cleanliness and be aware of normal hazards and take appropriate precautions.  (Tr. 561-62.)

First, Lee argues that because Ms. Woodyard's questionnaire and statement of functional abilities were countersigned by Scott Lee, Psy.D., a clinical psychologist, making these opinions those of an "acceptable medical source," the ALJ erred in considering them as only those of a "non-acceptable medical source."  (Opening Br. 21.)  But Lee misreads the ALJ's decision. When discussing Ms. Woodyard's opinions, the ALJ distinguishes between the letter Ms. Woodyard wrote in April 2009, stating that Lee was unable to work, which was signed by only Ms. Woodyard (Tr. 474), and Ms. Woodyard's questionnaire and functional ability statement (Tr. 558-62), which, contrary to Lee's assertion (Reply Br. 5), the ALJ explicitly recognized was "countersigned by a psychologist" (Tr. 26).  When discussing this April 2009 statement of disability, which was not co-signed, the ALJ noted that it was from an "unacceptable medical source."  (Tr. 26.)  Significantly, the ALJ does *not* make the same statement concerning Ms. Woodyard's questionnaire and functional ability statement; rather she notes that "this report is actually countersigned by a psychologist" (Tr. 26), suggesting that the ALJ recognized these opinions—unlike Ms. Woodyard's earlier, solo statement of disability—were from an acceptable medical source.  Therefore, Lee's argument on this front is a nonstarter.

Moving to Lee's attack on the ALJ's reasons for discounting Ms. Woodyard's opinion, the ALJ also found that her opinion was based on "VERY limited treatment" and on Lee's rather incredible complaints and very poor effort during therapy sessions. (Tr. 24.) In assigning "little weight" to Ms. Woodyard's mental impairment questionnaire and statement of Lee's functional ability, the ALJ again pointed to the "limited treatment" noted in the report and the significant symptoms listed that were based on Lee's self-reports. (Tr. 26.)

As to the amount of treatment, Lee argues that Ms. Woodyard had frequent contact with him as she did an "evaluation" in December 2008, many of his plan reviews, and saw him at least six times in 2009, with the record indicating that she saw him more than that (though the notes are missing). (Opening Br. 21.) First, although Ms. Woodyard completed many of Lee's treatment plans (*see* Tr. 396-401, 402-06, 442-47, 567-71, 585-90), there is no indication that Ms. Woodyard actually saw Lee on these days; he is not listed as a participant in any of these plans (Tr. 396, 402, 442, 567, 585) nor did he sign them (Tr. 401, 406, 447, 571, 590). And despite Lee's claims to the contrary, Ms. Woodyard did not evaluate Lee in December 2008 either; the record indicates that Ms. Woodyard completed only a treatment plan for Lee that month. (*See* Tr. 396-401.) Furthermore, according to the notes in the record, Ms. Woodyard saw Lee only five times in 2009, over a five-month period between April and September, for individual therapy sessions lasting about 45 minutes each. (Tr. 563-66, 572-75, 581-84, 595-98, 604-07.) But there is some indication that Lee attended therapy before these dates. (*See* Tr. 400 (noting in December 2008 that "[Lee] attends therapy regularly and participates well"), 420, 426 (both stating in April 2008 that Lee "was seen for two therapy sessions and no showed for a third").) Presumably, this additional therapy would have been with Ms. Woodyard, who is listed

as a therapist in all of Lee's treatment plans (Tr. 396, 402, 442, 567, 585), but there is also some

indication that Lee had therapy with someone named "Bambi" (Tr. 599 (stating that Lee "[p]lans

to continue therapy with Bambi")).  But, once again, the burden is on Lee to furnish medical

evidence to support his claim of disability, *see Castile*, 617 F.3d at 927; 20 C.F.R. §§

404.1512(a), 416.912(a), a burden he has ultimately failed to carry.

And even if Ms. Woodyard *had* seen Lee for these earlier therapy sessions, Lee cannot

escape the fact that Ms. Woodyard stated in her questionnaire that she did *not* see Lee with the

frequency consistent with the accepted medical practice for treating his medical conditions.  (Tr.

558); *cf. Susalla*, 2012 WL 2026268, at *10 (finding the ALJ's reasoning in discounting a

psychiatrist's opinion based on frequency of visits with the claimant "lacking" when there was

*no indication* that the visits were inconsistent with the frequency consistent with accepted

medical practice for the claimant's medical condition).  In assigning "little weight" to Ms.

Woodyard's opinion, the ALJ recounted this statement (Tr. 26 (stating that in the report, Ms.

Woodyard and Dr. Lee "note limited treatment")) and reasonably relied on it when determining

that Ms. Woodyard's opinion was based on very limited treatment (Tr. 24).  As such, this

reasoning is adequately supported by the record and provides substantial evidence for the ALJ's

discounting of Ms. Woodyard's opinion.

The ALJ also assigned little weight to Ms. Woodyard's problematic opinion because it

was based on Lee's rather incredible complaints and subjective reports and because she found

Lee not fully credible.  (Tr. 24, 26.)  Like with Ms. Lothamer's opinion, the ALJ reasonably

inferred that Ms. Woodyard's opinion was based primarily upon Lee's subjective reports, which,

as already discussed, the ALJ properly determined were not credible.  (Tr. 26); *see Ketelboeter*,

550 F.3d at 625; *White*, 415 F.3d at 659; *Stevenson*, 105 F.3d at 1155.  As such, this reason for discounting Ms. Woodyard's opinion is also adequately supported by the record.

Although, as recounted above, the ALJ's third reason for discounting Ms. Woodyard's opinion—that it was based on Lee's very poor effort during therapy sessions—is mistaken, the ALJ's other two reasons are supported by the record and provide substantial evidence for this decision, making the error harmless.  *See Skarbek*, 390 F.3d at 504 (concluding that an error is harmless when it "would not affect the outcome of the case"); *see also Fisher*, 869 F.2d at 1057 ("[N]o principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result."); *Susalla*, 2012 WL 2026268, at *10.  Accordingly, Lee's challenge to the ALJ's consideration of Ms. Woodyard's opinion also fails.

## V.  CONCLUSION

For the reasons articulated herein, the decision of the Commissioner is AFFIRMED.  The Clerk is directed to enter a judgment in favor of the Commissioner and against Lee.

SO ORDERED.

Enter for this 21st day of December, 2012.

S/Roger B. Cosbey\
Roger B. Cosbey,\
United States Magistrate Judge

28